[No. 29405-9-I.   Division One.   January 19, 1993.]

THOMAS M. MCDONAGH, *Appellant*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Respondent*.

*Kathryn Lynne Carman* and *Small, Snell, Logue & Weiss, P.S.,* for appellant.

*Christine O. Gregoire, Attorney General,* and *Kathryn Eims, Assistant,* for respondent.

WEBSTER, C.J. — Thomas M. McDonagh appeals a judgment in favor of the Department of Labor and Industries affirming the Board of Industrial Insurance Appeals' dismissal of his occupational injury claim. McDonagh claims he is entitled to a new trial since the trial court should have given the jury a "lighting-up" instruction. We agree.

## PROCEDURAL FACTS

On May 6, 1986, McDonagh filed an accident report with the Department alleging he had developed an occupational disease (*i.e.*, a major depressive illness accompanied by a phobic anxiety) as a result of his employment with Capital Savings Bank. On May 19, 1986, the Department rejected the claim on the grounds (1) there was no proof of a specific injury occurring during his employment; (2) the condition was not the result of an industrial injury; and (3) the condition was not an occupational disease pursuant to RCW 51.08.140.

On June 29, 1988, the Board affirmed the Department's decision rejecting McDonagh's claim. The Board determined that (1) "[t]he conditions of Mr. McDonagh's employment with Capital Savings Bank were not unusually stressful"; (2) it was his "subjective interpretation of events at work, not the events themselves, [which] produced stress"; and (3) his "major depressive illness and . . . anxiety disorder did not arise naturally and proximately out of and in the course of his employment with Capital Savings Bank".

On August 8, 1989, an industrial insurance appeals judge reversed the Board and allowed McDonagh to proceed with his claim. Upon petition for review, the Board reversed the industrial appeals judge's determination and ruled that McDonagh's medical conditions were not causally related to his employment.

McDonagh appealed the Board's decision to the Superior Court. At the conclusion of trial, McDonagh proposed the following jury instruction:

> You are instructed that if an industrial injury or occupational disease lights up or makes active a latent mental condition that was not causing disability, whether congenital or developmental, then the resulting disability is to be attributed to the occupational disease and not the pre-existing mental condition . . ..

Proposed instruction 12. The trial court rejected this "lighting-up" instruction,[1] ruling that it was inapplicable. On Octo-

---

[1]The lighting-up theory provides that if a preexisting dormant or latent condition is activated or "lighted up" by an industrial injury or occupational disease, the worker is entitled to benefits for the disability resulting therefrom.

ber 10, 1991, a jury upheld the Board and dismissed Mc-Donagh's claim.

## SUBSTANTIVE FACTS

McDonagh graduated from Washington State University in 1983 with a degree in economics. Shortly thereafter he went to work at Capital Savings Bank as a teller. In October of 1984, McDonagh became one of the bank's senior financial counselors.

By the end of 1985, McDonagh's mental health deteriorated to the point where he made several suicide attempts.[2] By early 1986, McDonagh suffered a breakdown and was hospitalized for 3 weeks.

McDonagh testified that a great deal of pressure and stress accompanied his job at the bank. He stated he did not feel he was able to tell the customers everything they needed to know about the products in order to make good decisions. McDonagh identified several instances which he perceived to be unusually stressful. The first involved an elderly woman who purchased an annuity and desired to withdraw her money prior to maturity in order to help with medical expenses. McDonagh explained he could not oblige her without the incurrence of penalties. The woman decided not to withdraw the money and subsequently died. The woman's son later blamed McDonagh for the death. The second instance involved a client who purchased an annuity and later asked McDonagh for a waiver of an early withdrawal penalty due to medical expenses. McDonagh sought the waiver, but his supervisor denied it and the client subsequently lost his legs. The third instance involved a similar situation with a terminally ill client seeking early withdrawal. McDonagh testified that these types of experiences caused him to begin suffering headaches, nausea, insomnia and memory loss.

Dr. Stephen Melson, a board-certified psychiatrist who treated McDonagh in 1986, testified on McDonagh's behalf.

---

[2]Co-workers noticed he began crying at work, was stubborn, and often appeared disheveled.

Dr. Melson stated that McDonagh, upon initial examination, was "unable to function very effectively in any area of his life." Dr. Melson diagnosed McDonagh with a major depressive illness accompanied by a phobic anxiety. He further testified that McDonagh's symptoms dated back to late 1985 and early 1986, were associated with concerns he had about work, and described McDonagh as

> a very conscientious person, perhaps excessively so at times, [who] took his responsibilities very, very seriously. He was always concerned with whether or not his actions were approved of by those around him, particularly by supervisors or bosses or parents, and I think he probably felt more a sense of guilt and remorse and responsibility than the average person. That's the makeup of his personality.

Dr. Melson further testified that McDonagh had a series of childhood problems (including ongoing problems with his parents), that the depressive illness was an outgrowth of his employment, and that McDonagh had a biological predisposition to depressive illness:

> [M]ost psychiatrists would agree that such persons prior to the onset of their major illness would share some personality characteristics such as I've described, excessive degree of conscientiousness, taking one's responsibilities so seriously, worrying about aspects of the job or the responsibilities there that other people might not worry so much about, being able to feel feelings of guilt and remorse more intensely than other people, and that a certain percentage of the population, perhaps those with a biological vulnerability, they will go on to develop then this full-fledged biological and psychological illness that we call a major depressive illness.

On cross examination, Dr. Melson testified that the "current understanding of this kind of illness is that a person has some degree of biological vulnerability or predisposition to develop it, and then it is triggered by many times something in the environment." Dr. Melson also stated he believed McDonagh had no diagnosable psychiatric condition prior to working for Capital Savings:

> [T]here was no prior history of any major or as far as I know diagnosable emotional disorder prior to his working there. We learned a lot about him in the course of our treatment about his development and his relationship of his family and some of

his personality traits and his concerns, but there was no prior episode of a diagnosed psychiatric disorder, to my knowledge, before that.

He further stated, when cross-examined on whether McDonagh had any psychological or emotional problems prior to working for Capital Savings, that

everyone has problems and everyone has issues of development such as you've been asking me about in their families, or most everybody has . . .. Now whether I could, had I seen him five years before and done an evaluation, could I have said that represents a psychiatric disorder . . . I don't know.

The Department called two witnesses. John Parry, a former Capital Savings employee, stated he held the same job as McDonagh and that he did not feel there was "undue stress" in his job. Chris Mundwiler, McDonagh's supervisor, also testified for the Department. He described McDonagh's work performance favorably but also stated he was aware of Mc-Donagh's psychiatric difficulties, knew McDonagh felt pressure to "stay on top", and believed that the situation at the bank was a "primary factor" in causing McDonagh's condition. Both Parry and Mundwiler testified that all counselors were encouraged to inform customers purchasing annuities that there would be an early withdrawal penalty if they decided to withdraw their money prior to maturity.

## DISCUSSION

McDonagh, citing *Wendt v. Department of Labor & Indus.*, 18 Wn. App. 674, 571 P.2d 229 (1977), claims that where there is substantial evidence to support the giving of an instruction on the lighting-up theory, it is reversible error to refuse to give such an instruction. Here, according to Mc-Donagh, the record is replete with evidence to support the giving of the instruction, such as Dr. Melson's testimony that McDonagh's personality characteristics predisposed him to this type of illness and that the stress of his employment was the causative factor in triggering his depressive disorder.

The Department, citing *Zipp v. Seattle Sch. Dist. 1*, 36 Wn. App. 598, 676 P.2d 538, *review denied*, 101 Wn.2d 1023

(1984), claims the lighting-up doctrine is inapplicable absent a diagnosable preexisting latent or asymptomatic medical condition and that personality characteristics cannot constitute such a condition. Specifically, the Department claims that McDonagh's personality characteristics have been manifest and active throughout his life and he has failed to establish that they constituted a preexisting condition which was "lit up".[3]

We find that the trial court should have given the "lighting-up" instruction to the jury. McDonagh is correct in that there is substantial evidence to support giving the instruction and, therefore, under *Wendt*, the instruction should have been given. Furthermore, contrary to the Department's claim, there is no prerequisite that there be a "diagnosed" or "preexisting" condition. This is evidenced by the *Wendt* court's use of the terms "quiescent or asymptomatic . . . condition" to describe the condition held to mandate the lighting-up instruction. *Wendt*, at 678. *Webster's Third New International Dictionary* 1865, 136 (1986) defines "quiescent" as "causing no symptoms" and "asymptomatic" as "presenting no subjective evidence of disease". In addition, there is no authority to support the proposition that a "personality characteristic" is precluded from qualifying as a preexisting condition. The fact that a biological predisposition for the development of a mental illness is the type of case encompassed by the lighting-up theory is exemplified by our court's use of such terms as "infirmity" or "weakness" to describe preexisting conditions. *See Miller v. Department of Labor & Indus.*, 200 Wash. 674, 682, 94 P.2d 764 (1939); *Dennis v. Department of Labor & Indus.*, 109 Wn.2d 467, 471, 745 P.2d 1295 (1987).

The Department also claims the trial court's instructions were sufficient since they enabled McDonagh to argue that

---

[3]The Department points to (1) Dr. Melson's testimony that McDonagh did not evidence any depressive illness or anxiety prior to his employment at Capital Savings and (2) the fact that because Dr. Melson had not evaluated McDonagh prior to the inception of the psychiatric condition he could not formulate an opinion regarding whether or not McDonagh had a preexisting asymptomatic condition.

his personality characteristics were not the "sole" cause of his alleged occupational disease, but rather only one proximate cause of the condition for which benefits are sought. Instruction 8 stated:

> The term "proximate cause" means a cause which in a direct sequence, unbroken by any new independent cause, produces the condition complained of and without such condition would not have happened.
>
> There may be one or more proximate causes of a condition. For a worker to recover benefits under the Industrial Insurance Act, the industrial injury or occupational disease must be a proximate cause of the alleged condition for which benefits are sought. The law does not require that the industrial injury or occupational disease be the sole proximate cause of such condition.

However, we find that the proximate cause instruction (instruction 8) did not serve the same purpose as the proposed lighting-up instruction since, as noted by the court in *Wendt*, the theory is esoteric and must be adequately explained to a jury:

> Such general or stock instructions might suffice were a less technical proposition involved. Here, however, a jury of lay persons might well consider the "lighting up" theory esoteric, to say the least. In such a case the law should be explicated by the judge in particular terms to insure that the jury grasps its subtleties. Finally, far from involving a mere fringe or subordinate issue, the requested instruction embodied the gist or substance of Wendt's claim. When such a key issue is involved, a correctly worded and particularized instruction should be given, and general instructions such as the court gave here will not suffice.

*Wendt*, at 679.

The judgment is reversed and the case is remanded for retrial.

KENNEDY and AGID, JJ., concur.